UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION



UNITED STATES OF AMERICA and
MARIA FALZARANO,

           Plaintiff/Relator,

v.                                                           6:20-cv-976-ORL-37ETK

KINGWOOD INTERNATIONAL RESORT,
LLC; KINGWOOD ORLANDO REUNION
RESORT, LLC; APDC CLEANING
SERVICES, INC.; FARBOD ZOHOURI;
RICHARD NASSER; ANTHONY CARLL;
and FIDEL HERNANDEZ,

           Defendants.

_____/

## **RELATOR'S COMPLAINT**

Relator, Maria Falzarano, hereby submits the following Complaint, filed under seal, in accordance with the requirements of the False Claims Act, 31 U.S.C. §3730(b)(2) and further states as follows:

## I.  INTRODUCTION AND SUMMARY OF ALLEGATIONS

### A.  THE CARES ACT and PPP LOANS

1.      An unprecedented pandemic struck the world over the last year.  The American economy has been decimated because of COVID-19. On March 27, 2020, the House of Representatives passed H.R. 748, the Coronavirus Aid, Relief, and Economic Security Act (the CARES Act, or 'the Act') without amendments and it was quickly signed into law by President Trump. The Act provided approximately $2 trillion in funding for COVID-19 relief and contains numerous provisions for tax relief for businesses. The Act established a Small Business Administration (SBA) – Business Loan Program (the 'Paycheck Protection Program' (PPP))

S-1

account for the purpose of COVID-19 related loans. For loans made under the PPP, the SBA will guarantee 100% of the loan amount.

2. The loan program applies to SBA loans made between February 15, 2020 and June 30, 2020 to businesses that employ not more than the greater of 500 employees; or, if applicable, the size standard in number of employees established by the SBA for the industry in which they operate. Special considerations are provided for organizations classified within NAICS code 72 (accommodations and food services) and that have no more than 500 employees per physical location are also eligible. The Act provides for maximum loan amounts based on average monthly payroll costs (excluding any compensation above $100,000 for any self-employed person) or a maximum of $10 million. Monthly payroll costs include wages, group health care benefits, retirement benefits, and unemployment taxes. A business receiving a loan under the program can use the proceeds for payroll costs, group healthcare benefits, mortgage interest, rent, utilities and interest on other debt that existed as of February 15, 2020.

3. The Act forgives SBA loans under the PPP if used for payroll costs, rent, mortgage interest and utilities for mortgages, leases, and utility service in effect before February 15, 2020 during an eight-week period beginning after the loan origination date. Forgiveness of the loan is reduced based on a formula that takes into account reductions in fulltime employees and certain reductions in compensation paid. The amount forgiven is limited to the principal amount of the loan. In determining forgiveness, the SBA will not penalize any borrowers that re-hire workers it previously laid off for having a reduced payroll at the beginning of the period.

4. As part of the SBA PPP loan application process, applicants are required to submit certifications that outline the requirements for obtaining the loan, limitations for the use of funds, and penalties if there is any falsity in the application process. As shown below, applicants are

CERTIFICATIONS

The authorized representative of the Applicant must certify in good faith to all of the below by **initialing** next to each one:

_____ The Applicant was in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099-MISC.

_____ Current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant.

_____ The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud.

_____ The Applicant will provide to the Lender documentation verifying the number of full-time equivalent employees on the Applicant's payroll as well as the dollar amounts of payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities for the eight-week period following this loan.

_____ I understand that loan forgiveness will be provided for the sum of documented payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities, and not more than 25% of the forgiven amount may be for non-payroll costs.

_____ During the period beginning on February 15, 2020 and ending on December 31, 2020, the Applicant has not and will not receive another loan under the Paycheck Protection Program.

_____ I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000.

_____ I acknowledge that the lender will confirm the eligible loan amount using required documents submitted. I understand, acknowledge and agree that the Lender can share any tax information that I have provided with SBA's authorized representatives, including authorized representatives of the SBA Office of Inspector General, for the purpose of compliance with SBA Loan Program Requirements and all SBA reviews.

Signature of Authorized Representative of Applicant                    Date

Print Name                                                            Title

required to initial next to each of the eight certifications and sign at the bottom acknowledging he or she certifies compliance with the requirements.

5.      As described in detail herein, Defendants' scheme to defraud the government violates nearly every single certification and aims to further deceive the government by attempting to obtain forgiveness of the ill-gotten PPP loans.

B. KINGWOOD SEEKS PPP

6.      On April 14, 2020, Relator, who serves as Director of Human Resources, and Doris Delgado, who serves as Payroll Manager, both with Kingwood International Resorts, LLC Orlando Reunion Resort (hereinafter referred to as Defendant Kingwood), were tasked by Defendant

Anthony Carll, General Manager of the resort, to pull payroll reports after telling both of them that "ownership" was looking into obtaining a PPP loan, possibly from Regions Bank. On that same date, Defendant Richard Nasser, President of Defendant Kingwood, also called Relator and asked that numerous payroll reports be converted from Excel spreadsheets to PDF format, as the bank where the company was applying for the PPP loan required the payroll documents in that format. At this point in time Defendant Kingwood had already furloughed over 200 employees and had approximately 120 employees still actively working and being paid. On May 4, 2020, Defendant Carll called Relator with questions regarding how many employees would need to be brought back on payroll to meet the forgiveness criteria under the PPP loan requirements. Defendant Carll then told Relator that it wouldn't be "*worth it*" to bring back employees for two months, only to furlough them again. At this point, Relator assumed Defendant Kingwood had decided against pursuing a PPP loan.

7. On May 6, 2020, Defendant Carll texted Relator at approximately 4:45 p.m. and asked her to meet him at his office. It was during this meeting that Defendant Carll told Relator of a conspiracy between Defendant Kingwood and Defendant APDC Cleaning Services, Inc. (hereinafter referred to as Defendant APDC), and their ownership, Defendant Farbod Zohouri, founder of Kingwood International Resorts, LLC, and Defendant Fidel Hernandez, CEO of APDC. The plan which Defendant Carll revealed to Relator involved "*ownership*" wanting to add 100-150 "*employees*" to the payroll for an 8-week period so they could qualify for loan forgiveness under the PPP requirements, with no intention of bringing back their furloughed employees, nor actually paying them. Defendant Carll told Relator that Defendant APDC had already provided the names, dates of birth and social security account numbers to Defendant Zohouri of approximately 150 individuals who were spread out all over Florida and would not actually be

working, but who could be reported to the federal government as employees who were benefitting under the PPP loan.

8.    Additionally, Relator was told that Defendant Kingwood had similarly applied for other PPP loans for other properties, such as The Plantation at Crystal River, with the intention of pocketing the funds received from the federal government in lieu of actually paying the employees the loans were intended for.

9.    The named individual Defendants led, participated, conspired and profited from the scheme to defraud the government of PPP loan funds.

## II.    PARTIES

### A. Relator

10.    **Maria Daniela Falzarano** is a resident of Champions Gate, Florida. Ms. Falzarano attended the University of Central Florida where she received a Bachelor of Science in Hospitality Management, with a focus in Hotel Management, in December 2008.

11.    Ms. Falzarano began employment, and remains employed, as Director of Human Resources with Defendant Kingwood in February 2019 when the company took over the Reunion Resort & Golf Club from her previous employer. From June 2015 through the end of January 2019, Ms. Falzarano was employed as Director of Human Resources at Reunion Resort with the Salamander Resorts company. Prior to that, Ms. Falzarano was employed as Assistant Director of Human Resources with the Salamander Resorts company. From August 2012 through July 2013, she was employed as the Human Resources Coordinator for Select Medical. From June 2006 through July 2012, Ms. Falzarano worked in human resources with Wyndham Resorts in Orlando, Florida.

12.     Relator is an original source of information within the meaning of the False Claims Act, 31 U.S.C. §3730(e)(4)(B).

**B.  Defendants**

13.     **Kingwood International Resort, LLC** is a Domestic limited liability company and was first registered with the state of Georgia Secretary of State's office on March 20, 2015. The company has a registered principal address of 400 Curie Drive, Alpharetta, Georgia 30005. The registered agent for the company is listed as Kevin Caiaccio, 5605 Glenridge Drive, Bldg. 1, Suite 1090, Atlanta, Georgia 30342. Per a document titled "Kingwood Entities" located during an internet search, and dated April 2019, Fred Zohouri, also known as Farbod Zohouri, is listed as Founder and CEO of Kingwood and Richard Nasser is listed as President of Kingwood's Resort Division.

14.     **Kingwood Orlando Reunion Resort, LLC** is a Domestic Limited Liability Company and was first registered with the state of Florida Secretary of State's office on August 1, 2018. The company has a registered principal address of 400 Curie Drive, Alpharetta, Georgia 30005. The registered agent for the company is listed as Ping Wang, 7593 Gathering Drive, Kissimmee, Florida 34747. The authorized persons listed are Fred Zohouri and Ping Wang, Managers, 400 Curie Drive, Alpharetta, Georgia 30005.

15.     **APDC Cleaning Services, Inc.** is a Florida Profit Corporation and was first registered with the state of Florida Secretary of State's office on July 3, 2017. The company has a registered principal address of 5824 Precision Drive, Orlando, Florida 32819. The registered agent for the company is listed as Elsa Bardales, 5824 Precision Drive, Orlando, Florida 32819. The

Officer for the company is also listed as Elsa Bardales. Per the company's website[1] Fidel Hernandez is listed as the Chief Executive Officer.

16.    **Farbod Zohouri, a/k/a Fred Zohouri,** is a resident of Atlanta, Georgia. Per the Georgia Secretary of State filing, Mr. Zohouri is listed as Founder and CEO of Kingwood International Resort, LLC. Per the Florida Secretary of State filing, Mr. Zohouri is listed as a manager for Kingwood Orlando Reunion Resort, LLC.

17.    **Richard Nasser** is a resident of Carrollton, Georgia. Nasser is listed as President of Kingwood's Resort Division.

18.    **Anthony Carll** is a resident of Winter Haven, Florida. Carll is listed as General Manager of Reunion Resort per his LinkedIn profile.

19.    **Fidel Hernandez** is a resident of Kissimmee, Florida. Per the APDC website[2] Mr. Hernandez is the Chief Executive Office for the corporation.

## III.    THE NATURE OF THE CASE

20.    Relator began employment with Defendant Kingwood International Resorts, LLC, when the Reunion Resort was purchased by the Defendant Kingwood in February 2019. Prior to the purchase, Relator had worked for the previous owner, Salamander Resorts, in the same position as Director of Human Resources. Soon after the purchase, Defendant Anthony Carll was promoted from Director of Engineering to Assistant General Manager. In October 2019, Defendant Carll was promoted to General Manager and the incumbent General Manager was moved over to the position of Corporate Director of Golf & Membership. On several occasions, Defendant Carll made it personally known to Relator that he was *"planted"* at Reunion by Defendant Kingwood prior to the sale of the property so that they could obtain company information beyond the scope

---

[1] http://apdc-services.com/about-us.html
[2] http://apdc-services.com/about-us.html

of what would ordinarily be known in a commercial real estate transaction.

21.     The following is a timeline of events that have occurred pertaining to the PPP loan received from the federal government under false pretenses, and the scheme that has been put in place by Defendants to profit from the loan by filing for loan forgiveness from the Small Business Administration:

**Late April 2020**

22.     At some point during the last week of April, Defendant Carll started requesting payroll reports from Relator and Doris Delgado, Payroll Manager, telling them that ownership was looking into obtaining a PPP loan. At this point in time over 200 employees had been furloughed while 120 employees were still actively working. Prior to April, as of March 7, 2020, the total employee headcount was 422.

**May 4, 2020**

23.     On May 4, 2020, Defendant Carll called Relator at approximately 9:30 a.m. with questions regarding payroll, specifically how many active employees Defendant Kingwood had and how many would be needed to be brought back on payroll to meet the forgiveness criteria under the PPP loan program. Realtor provided the number of employees who had been furloughed and calculated the amount needed to be brought back on payroll as requested. Defendant Carll asked Relator about payroll totals for the prior payroll period, pre-COVID-19, and suggested to Relator that it was not "*worth*" the effort to bring back furloughed employees for two months, only to furlough them again. Defendant Carll then told Relator that Defendant Kingwood had until Thursday, May 7, 2020, to decide if it made any sense to pursue a PPP loan. It was Relator's understanding from this conversation that because it would not benefit Defendant Kingwood, it was not something ownership would proceed with.

**May 6, 2020**

24. On May 6, 2020, Defendant Carll texted Relator at approximately 4:45 p.m. requesting that Relator come see him in his office as he had just finished up a meeting with ownership and Defendant APDC. Defendant Carll told Relator that Defendant APDC, Defendant Kingwood's provider of cleaning and housekeeping services, as well as some security services, had approached Defendant Kingwood for help in keeping the company afloat as all of their accounts had been suspended. Defendant Carll further told Relator that Defendant Kingwood was looking to hire some of Defendant APDC's staff or make a loan in some way to Defendant APDC. Defendant Carll then asked Relator what information would be needed to hire 100 to 150 new employees and suggested that he already had a list of names, dates of birth, and social security account numbers. Relator explained to Defendant Carll that human resources would need to see the employees in person and have them complete I-9 and W-4 forms. On this same date, Defendant Zohouri emailed Doris Delgado and notified her that he needed to change the payroll funding account to a new one. This was an unusual request and Doris Delgado reached out to Relator and asked if she, Delgado, should notify Defendant Carll about the request which Relator directed her to do so.

**May 8, 2020**

25. On the afternoon of May 8, 2020, Doris Delgado telephoned Relator and asked what was going on with Defendant Carll. Delgado further explained that Defendant Carll had contacted her to inquire about entering 100 new employees into payroll. Defendant Carll had further asked Delgado who the Automated Data Processing (ADP) representative was and if she, Delgado, could hire these new employees. Delgado told Relator she had told Defendant Carll that

hiring new employees involved much more than just entering information into the ADP payroll program and that he needed to speak with human resources.

**May 11, 2020**

26.     On the morning of May 11, 2020, at approximately 10:00 a.m., Defendant Carll telephoned Relator asking if she would be in her office.  When she replied that she would, shortly thereafter he came down to see her. Ximena Ball, Assistant Director of Human Resources for Defendant Kingwood, was sitting at the reception desk when Defendant Carll arrived. They chatted about paperwork for a few minutes before Defendant Carll walked into Relator's office. Defendant Carll told Relator that they needed to talk as "friends" first and figure out what needed to be done regarding the PPP loan and hiring of new employees. Defendant Carll told Relator that over the weekend he had figured out that ownership wanted to profit from the PPP loan funds, as opposed to what they certified in their PPP loan application. Defendant Carll told Relator that Defendant Zohouri had personally directed that 150 employees be hired over the next month and that he was to work with Defendant APDC to complete their paperwork. Defendant Carll further told Relator that he had warned Defendant Zohouri that he would have to get other people involved so this would not be something just between Defendant Carll and Defendant Zohouri at which time Defendant Zohouri told Defendant Carll to "*just get it done*" and once the Reunion property was done to "*put Plantation in*" as well.

27.     Relator told Defendant Carll that he would be sticking his neck out on this and that she was concerned Ball and Delgado would question 150 new hires with no files or documentation. She was confused why Defendant Kingwood would bring on new hires rather than bring furloughed employees back. Defendant Carll told Relator that Delgado had reached out to him the previous Friday about the request from Defendant Zohouri to change payroll funding and that

Jasmin Delgado, Account Manager for Defendant Kingwood and daughter of Doris Delgado, had emailed him earlier during the day to tell him that Defendant Kingwood had $2.6 million in their account from the PPP loan that had been received. At that time, Relator walked Defendant Carll through the process of completing the I-9 and E-Verify forms. Relator then pulled a completed I-9 form and asked Defendant Carll to review the I-9 requirements. Relator told Defendant Carll that she was not comfortable simply filling out I-9 forms from a spreadsheet he had with employee data.

28.     Defendant Carll then asked what Relator thought about bringing in Alicia Amaro, Chief Financial Officer (CFO) for Defendant APDC, and letting her do the paperwork. Relator informed Defendant Carll that that was his call and Amaro could be in charge of the project and do whatever he, Defendant Carll, directed her to do. Defendant Carll then told Relator that everyone needed to be hired, on paper, as of May 11, 2020 and went on to exclaim *"the bitch [Amaro] emailed a spreadsheet to Fred with names, addresses, social security account numbers, dates of births, everything."* Defendant Carll then told Relator that he and she could go back to ownership together and tell them they were not willing to participate.  However, they would then be *"packing up our shit"*. Defendant Carll then joked that they could always start looking for a new job after all this passed. Relator then told Defendant Carll that he needed to decide whether he was willing to do what Defendant Zohouri was wanting him to do, but reiterated that she was personally not okay with that level of liability and would not be involved.

29.     Defendant Carll then asked Relator *"what if they furlough you and I, we still collect our paycheck, and then we have no knowledge, would that be okay?"*. Relator did not respond to that suggestion. Defendant Carll then went on to say, *"I'm not okay risking my life and my family's life, so some other guy can put two-million into his pocket. Then I started thinking, well let me be*

*smarter than them. I got the plan, I got the person to do it, but you need to take care of me and Daniella and I want it in cash or I need a car delivered here tomorrow. I want you to lease the Director of Human Resources and the GM a car and this is what I want it to be. I think you would look dope in a Range Rover"*. Relator did not respond to Defendant Carll other than to say she just wanted to do her job and be paid her salary. The conversation ended in about an hour and Defendant Carll left with the idea he was going to hire Alicia Amaro to onboard the 150 APDC employees.[3]

**May 12, 2020**

30.     On May 12, 2020, at approximately 3:00 p.m., Defendant Carll came to Relator's office and told her that he thought Alicia Amaro had gotten cold feet about the employee project. Defendant Carll said that he had texted her twice and had gotten no response. He further said that he really did not want to get involved, but that he felt bad saying no to the owner. Defendant Carll further told Relator that he was worried about his reputation and being associated with Kingwood Reunion if it was ever discovered and came out. He further said that he did not mind operating in the grey area when it was just business, like setting up security and landscaping companies for the owners to get paid. Defendant Carll told Relator that Defendant APDC billed Defendant Kingwood $92,000/month and then Defendant Kingwood turned around and billed the Homeowners Association (HOA) $142,000/month, which put $50,000/month *"in Fred's pocket"*. He further told Relator, the owners of Defendant Kingwood made money from the HOA *"all the time"* and that they had cleared $100,000 from painting the Grande. In addition, Defendant Kingwood had made money off a roofing job at Heritage Crossings by finding a local contractor to do the job for $40,000 and marking it up to the Home Owners Association. Defendant Carll then told Relator

---

[3] At this time, Relator decided to seek counsel for legal advice on filing an FCA case regarding the fraudulent activity.

that Defendant Zohouri and Defendant Richard Nasser were arriving that day and there would be more dialogue about the PPP project. He further told Relator that Defendant Zohouri had told him, Defendant Carll, that she, the Relator, just needed to change her mentality on how she looked at things and play ball.

## May 13, 2020

31.     At approximately 11:50 a.m. on May 13, 2020, Relator went to Defendant Carll's office at his request so he could inquire about getting ADP access for Alicia Amaro. Defendant Carll then told her that Defendant Zohouri and Defendant Nasser were in town to "*get the project done*". Defendant Carll told Relator he had not slept thinking about all of this, as he knew Defendants Kingwood and APDC were committing fraud, and he wanted nothing to do with it. He further told Relator that he did not want either of their names on anything for their own protection. Relator told him that she absolutely agreed, but also was not in a position to be unemployed. Defendant Carll then told Relator to trust him, that he always had her back, and that he trusted her and probably told her more information than he should have because he knew she had his back. Relator then told Defendant Carll that she just wanted to be paid her salary, which had been reduced by this time, and just do her job and not be involved in this scheme.

32.     Defendant Carll then told Relator that Defendant Nasser had obtained ADP access for the Plantation, another property owned by Defendant Kingwood, and was working on hiring ghost employees for that location as well. He then asked Relator how to get Alicia Amaro access to ADP, which she then told him she did not think it was a good idea as then Amaro would have full access to all payroll records. Defendant Carll agreed and then directed Relator to get both he and Defendant Nasser immediate access to ADP so they could enter the ghost employees. Defendant Carll further told Relator that 40 employees were coming from the Security team, made

up of Defendant APDC employees, and 50 employees from Defendant Fidel Hernandez's office as well as from other resorts. He then asked if Relator would be comfortable hiring security employees which Relator told him she was because she knew the employees were both real and legal.

33.     Defendant Carll then described how Defendants Zohouri, Nasser, and Hernandez planned to make money from the PPP loan they had received. He told Relator that they wanted to create a weekly pay period and pay security employees double pay for the week (example: if a security employee earned $15/hour x 40 hours, gross pay would be $600, but Defendants planned on paying each employee $30/hour x 40 hours for gross pay of $1,200) The security employees would be told that their pay was for a two-week period, yet another check would be issued the following week for another $1,200 per/employee which would be retained by the Defendants and allow them to receive an additional two months of free payroll. Relator told Defendant Carll that she understood, at which time he told her that he would meet with Defendant Nasser, but to go ahead and get both he, and Defendant Nasser, access to ADP so they could execute this plan. At that time, the meeting was ended.

**May 18, 2020**

34.     On May 18, 2020, at approximately 11:00 a.m., Defendant Carll asked Relator to come to his office to discuss the new security employees. When Relator arrived at the office, Defendant Carll showed her an Excel spreadsheet containing a list of names, social security account numbers, addresses and pay rates that he had received and proceeded to tell Relator that they would need to double their hourly rate. Defendant Carll advised Relator that the security employees needed to be paid weekly and then proceeded to draw a pay schedule on a blank paper (see photograph below). Defendant Carll then wrote the start and end of each pay week and then

alternated each one and wrote "we" and "them" meaning that Relator was to issue paper checks to security employees every other week, but run payroll every week and give Defendant Carll the paper checks issued every other week.



35.     While Relator was in Defendant Carll's office he received an email from Michael Mancke, General Manager, for the Plantation property owned by Defendant Kingwood. Defendant Carll opened the email in front of Relator and then reported, "*the Plantation people are getting skittish*". As Defendant Carll was reading the email his cellular telephone rang and he answered the call using the speaker function. Relator then recognized the voice of Defendant Nasser who asked Defendant Carll about pay rates and if he, Defendant Carll, was sure they were calculated accurately. Defendant Carll then did some calculations on his phone and confirmed the number with Defendant Nasser telling him he would call him later because he and Relator were working on the security employees. At that point in the meeting Relator told Defendant Carll that she would

start getting the paperwork ready and meet with Victor Vargas, Director of Security, and Doris Delgado in payroll to get everything set up.

36.　　When Relator returned to her office, Vargas had already sent a meeting request for 2:00 p.m. that day and arrived at the meeting time with John Cruz, Security Liaison, for Defendant APDC. Prior to the meeting Vargas had sent Relator and Defendant Carll a list of his security employees with their pay rate. Vargas' list had 8 more people on it than Defendant Carll's list did. Relator asked Doris Delgado to join the meeting. During the meeting, Vargas asked if the transition was temporary, to which Relator replied that it was to only be for two months. Delgado asked about APDC's pay week and pay periods, to which Cruz responded that he would send her the payroll that had just been submitted for the week of May 11, 2020. Relator and the other participants agreed to get everyone onboarded by the end of the day on Tuesday, May 19, 2020, so that Delgado could run payroll and the security employees would have their first check by Friday, May 22, 2020. Delgado stated that she did not understand why a weekly payroll for security employees needed to be run if they were already on bi-weekly pay periods and would return to that cycle after two months. Relator told Delgado that she would confirm the instructions with Defendant Carll, but that was his direction to her.

37.　　At approximately 5:00 p.m. Relator was preparing to leave for the day and had submitted 31 personnel action forms (PAF) to Defendant Carll for e-signature when Relator received a call from him. Defendant Carll informed Relator that all security employees on Vargas' list should be hired. Defendant Carll further asked Relator to come to his office the following afternoon to show him how to enter new hires in the ADP system. At 6:27 p.m. Defendant Carll texted Relator to "*add the others*" with the exception of an employee who was on light duty and "*Farias*". Farias is the fiancée of Katherine Heredia, Training Manager for Defendant Kingwood.

**May 19, 2020**

38.    On May 19, 2020, at the conclusion of a weekly leadership meeting, Defendant Carll texted Relator at 10:16 a.m. and asked when Relator was coming back to his office to show him how to enter new employees into the ADP system. Relator replied that she would come up to his office shortly. At approximately 11:00 a.m. Relator entered Defendant Carll's office where he was reviewing payroll reports. Defendant Carll then asked Relator to show him how to hire all the people that were displayed on a spreadsheet he opened which was titled *Reunion Payroll PPP*. Relator walked Defendant Carll through the administrative login in the ADP system, and then showed him how to enter a new hire. Defendant Carll started with adding Alicia Amaro, Chief Financial Officer for Defendant APDC, as a Traditions Restaurant Manager making $2,500 every two weeks (see photo below).



39.     Defendant Carll complained about the lengthy process and asked if there was a way to just upload all of the data from the spreadsheet into the payroll system. Relator asked how many employees he had to add which Defendant Carll replied that he had 28 hires to add. Relator glanced at the open spreadsheet and saw that the names of Defendant Fidel Hernandez, Alicia Amaro and Oscar Hernandez, brother of Fidel and Reunion Account Manager for Defendant APDC, were on the list showing each of them making $10,000, which Relator assumes was the amount each would make over the 8-week period. After Defendant Carll finished entering all the information for Amaro, he commented that it was a lot of work and that he did not like the idea that his name was tied to this. Relator told Defendant Carll that it was going to raise red flags with Doris Delgado and Ximena Ball when they saw that he had entered a bunch of new hires without human resources being involved. Defendant Carll commented that he was not comfortable with the whole thing and was going to call Defendant Nasser and then get back to Relator.

*40.*     When Relator returned to her office, Doris Delgado and Ximena Ball were working to hire the security employees and completing their I-9 forms. Ball commented that the pay rates were ridiculous and asked Relator if it was legal. Relator told Ball that as long as the employees were being hired by the book, Relator was not concerned. At approximately 5:00 p.m. Defendant Carll came down to Relator's office and asked for the W-4's for the security employees. Defendant Carll commented that Defendant Kingwood was hiring the same security officers at the Plantation property so the company would get four months of free security payroll. Relator told Defendant Carll that her team was not happy with the security pay rates and were asking a lot of questions. Defendant Carll laughed and said *"wait till they see the other ones we are entering"*.

**May 21, 2020**

41.     On May 21, 2020, Relator learned that Defendant Kingwood had added four (4) new "hires" to their payroll to inflate their PPP loan forgiveness numbers with no intention of actually paying these ghost employees. All four (4) employees, whose names and other information were provided by Defendant APDC to Defendant Kingwood, were entered into the ADP payroll system as Food and Beverage (F&B) managers for Traditions Restaurant, an on-property restaurant at Reunion Resort, that is presently closed and is not scheduled to open any time in the near future. The ghost employees entered into payroll are as follows:  Eliana Rodriguez, Chadwick Hardee, Bethsy Torres and Alicia Saez-Rivera.

**May 27, 2020**

42.     On May 27, 2020, Relator discovered that Defendant Zohouri had been listed as a new hire for Defendant Kingwood (see photo below) making $195,000/year, ostensibly as a Manager for Traditions Grille, a closed eatery within the Reunion Resort, although he resides in Georgia.

*REMAINDER OF PAGE INTENTIONALLY
LEFT BLANK*



43.     Additionally, Defendant Zohouri's son, Joshton Zohouri, was also listed as a new hire for Defendant Kingwood (see photo below) making $91,000/year, ostensibly also as a Manager for Traditions Grille, although he too lives in the state of Georgia and does not maintain a residence in Florida.



44.     As of this date, 31 "new hires" have been added as Managers for the closed Traditions Grille.

**May 29, 2020**

45.     On May 29, 2020, payroll checks will be issued to "ghost employees" masquerading as F&B managers for Traditions Restaurant, as security employees, and possibly other positions. Checks issued on this day will be retained by Defendants and deposited in accounts, yet unknown, for their benefit.

46.     Additionally, Relator was told by Defendant Carll that a new project was being started, known as the Bahama Grand Sur project, by Defendant Kingwood.  Under the new project, the company is starting to sell lots at $400,000 and that they planned to inflate the prices of the

properties by half. Defendant Carll joked and told Relator to "*Google Fred and see what you find out about him inflating real estate*".

47.     As of May 29, 2020, the scheme to defraud the PPP loan program, the federal government, and, ultimately, the United States taxpayer, is ongoing. Payroll issued every other week has been designated to line the pockets of the named Defendants who, instead of bringing back furloughed employees and paying them, would rather personally benefit from a program that was passed to help the unemployed.

## IV.    DAMAGES

48.     Relator estimates the minimal amount of damages to the federal government would be $2.6 million dollars, based on her knowledge that the fraudulent PPP program loan proceeds were placed into Defendant Kingwood's banking accounts on or before May 11, 2020. Relator has been told that the Plantation at Crystal River property, also owned by Defendant Kingwood, was in the process of applying for a separate PPP loan, but is unsure of the amount potentially received by that property. In addition to the fraudulent activity causing monetary damages, it is incalculable as to the amount of damage that has been caused to those employees who were furloughed by Defendants and not brought back as employees, as was the intent of the PPP loan program.

## V.    THE FALSE CLAIMS ACT

49.     The FCA, as amended, provides in pertinent part that:

> [A]ny person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; ... or (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States

> Government for a civil penalty of not less than $11,181 and not more than $22,363, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990...plus 3 times the amount of damages which the Government sustains because of the act of that person. 31 U.S.C. § 3729(a)(1).

50.     The terms "knowing" and "knowingly" in the FCA provision above "mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A).  No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B).

## VI.   CLAIMS FOR RELIEF

### COUNT I
### False Claims Act: Presentation of False Claims
### 31  U.S.C. § 3729(a)(1) and 31 U.S.C. § 3729(a)(1)(A)

51.     Relator repeats and incorporates by reference the allegations contained in paragraphs 1-50 of this Complaint as if fully set forth herein.

52.     Defendants knowingly presented, and caused to be presented, false or fraudulent claims as part of their PPP loan applications to obtain funds provided under the CARES Act for COVID-19 relief. Notwithstanding their past false and fraudulent submissions, Defendants continue to create and present false payroll information to support forgiveness of the loans.

53.     The United States, or its authorized agent, paid the false and/or fraudulent claims.

54.     Had the United States known of the false of fraudulent claims for PPP loan funds provided under the CARES Act, it would have refused to authorize loan payments for COVID-19 relief.

55.     By virtue of the false or fraudulent claims that Defendants made and/or caused to

be made, the United States suffered damages and is therefore entitled to treble damages under the

FCA, to be determined at trial, plus civil penalties of not less than $11,181 and up to $22,363 or

such other penalty as the law may permit and/or require for each violation of 31 U.S.C. §3729, *et*

*seq.*

### COUNT II
#### False Claims Act: Presentation of False Statements
#### Material to False Claims (31 U.S.C. § 3729(a)(1)(B))

56.     Relator repeats and incorporates by reference the allegations contained in

paragraphs 1-50 of this Complaint as if fully set forth herein.

57.     Defendants knowingly made, used, or caused to be made or used false statements

material to false or fraudulent claims and to get such claims paid by the United States with respect

to claims as part of their PPP loan applications to obtain funds provided under the CARES Act for

COVID-19 relief.

58.     This conduct created FCA liability in that each claim for payment submitted or

caused to be submitted by the Defendants to government SBA loan programs was accompanied

by an express or implied certification that the transaction was not in violation of federal or state

statutes, regulations, or program rules.  Each of those certifications was false, because Defendants

did not meet the program requirements at the time of application and falsified their employment

records and payroll, after the application to validate the loan.

59.     Thus, each claim in their PPP loan application certifying compliance by the

Defendants' constituted a violation of the FCA.

60.     Said false statements were made with actual knowledge of their falsity, or with

reckless disregard or deliberate ignorance of whether or not they were false.

### COUNT III
#### False Claims Act: Conspiracy

31 U.S.C. § 3729(a)(1)(C)

61.    Relator repeats and incorporates by reference the allegations contained in paragraphs 1-50 of this Complaint as if fully set forth herein.

62.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein Defendants' conspired with each other along with unknown or unnamed parties to make or present false or fraudulent claims and performed one or more acts to effect payment of false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(C), which conspiracy caused the United States to incur damages.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Relator, on behalf of the United States of America demands judgment against the Defendants, ordering that:

a.    That Defendants cease and desist from violating 31 U.S.C. §3729 *et seq.*

b.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States government has sustained because of Defendants' actions, plus a maximum civil penalty for each false claim, together with the costs of this action, with interest, including the cost to the United States government for its expenses related to this action.

c.    That this Court enters judgment against Defendants for the maximum amount of actual damages under 31 U.S.C. §3729 *et seq*.

d.    That Relator be awarded all costs incurred, including attorneys' fees.

e.    That the United States and Relator receive all relief, both in law and in equity, to which they are entitled.

## DEMAND FOR JURY TRIAL

Dated: June 1, 2020

Respectfully submitted,

BY*: /s/ James D. Young*
James D. Young (FBN 567507)
jyoung@forthepeople.com

MORGAN & MORGAN
COMPLEX LITIGATION GROUP
76 S. Laura St., Suite 1100
Jacksonville, FL 32202
(904)361-0012 Telephone
(904)366-7677 Facsimile

Juan Martinez (FBN 1013923)
juanmartinez@forthepeople.com
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
201 North Franklin Street, 7th Floor
Tampa, Florida 33602
(813) 393-5463 Telephone
*Attorneys for Plaintiff/Relator*